UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
JAMAL LAURENT,

                       Plaintiff,                              **<u>MEMORANDUM & ORDER</u>**
                                                        17-CV-3300 (PKC) (CLP)

              - against -

ROBIN EDWIN, CLINICAL DIRECTOR,

                       Defendant.
--------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

On May 30, 2017, Plaintiff, proceeding *pro se*, brought this action against Defendant Robin Edwin, M.D.[1] and Michael Borecky, M.D., alleging Fifth and Eighth Amendment violations in connection with his medical treatment in prison. (*See generally* Complaint ("Compl."), Dkt. 1.) On June 12, 2018, the Court dismissed the claim against Dr. Borecky, but permitted the Fifth Amendment claim against Defendant Edwin ("Defendant") to proceed on the theory that Defendant acted with deliberate indifference when he denied a request for Plaintiff to have an orthopedic evaluation by an outside consultant. *See Laurent v. Borecky*, No. 17-CV-3300 (PKC) (JO), 2018 WL 2973386, at *3 (E.D.N.Y. June 12, 2018). Defendant's motion for summary judgment is now before the Court. (Dkt. 47.) For the reasons stated herein, Defendant's motion for summary judgment is granted.

---

[1] In initiating the instant action, Plaintiff identified Defendant as "Robert Edwin," however, Defendant's name is "Robin Edwin." (*See generally* Dkt. 47-3.) The Court respectfully directs the Clerk of Court to correct the docket accordingly.

# BACKGROUND

## I.    Undisputed Materials Facts

Beginning in 2011, Plaintiff was detained at the Federal Bureau of Prison's Metropolitan Detention Center ("MDC") in Brooklyn, New York while awaiting trial.  (Defendant's Rule 56.1 Statement of Material Facts ("Def.'s 56.1"), Dkt. 47-4, ¶ 1.)[2]  Plaintiff thereafter was convicted on March 17, 2015 and sentenced on November 10, 2015.  (*Id.* ¶¶ 2–3.)  On December 29, 2015, Plaintiff was transferred to the United States Penitentiary, Hazelton in Bruceton Mills, West Virginia ("USP Hazelton").  (*Id.* ¶ 4.)

Defendant, an internal medicine doctor, was employed as Clinical Director of the MDC from July 14, 2013 to November 18, 2014.  (*Id.* ¶ 5.)  As Clinical Director, Defendant's duties included chairing the MDC's Utilization Review Committee ("URC") and providing medical care to individuals housed at the MDC.  (Declaration of Robin Edwin ("Edwin Decl."), Dkt. 47-3, ¶ 4.)  The URC, which was comprised of the Clinical Director and other MDC medical providers, reviewed requests for certain types of medical treatments, such as non-emergent consultations with specialists, like neurologists and orthopedists, and procedures like magnetic resonance imaging ("MRI") performed outside of MDC.  (*Id.* ¶¶ 4–5.)

---

[2] Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citation to a party's 56.1 statement incorporates by reference the documents cited therein.  Where relevant, however, the Court may cite directly to the underlying document.  The Court has deemed facts averred in a party's 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed.  *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."  (emphasis in original)).  Additionally, to the extent a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement.  *See Risco v. McHugh*, 868 F. Supp. 2d 75, 87 n.2 (S.D.N.Y. 2012) (citations omitted).

### A.    Plaintiff's Medical History Prior to Any Alleged Action by Defendant

On April 27, 2011, Plaintiff reported to a Mid-Level Medical Provider ("MLP") at the MDC that he had level "6" out of 10 pain in the plantar[3] part of his left foot that had been ongoing for the prior two months.  (Def.'s 56.1, Dkt. 47-4, ¶ 10; Dkt. 51-1, at ECF[4] 36.)  The MLP performed a physical examination, identifying muscle spasm, tenderness, and decreased range of passive motion in Plaintiff's foot, and prescribed ibuprofen for pain.  (Def.'s 56.1, Dkt. 47-4, ¶ 10; Dkt. 51-1, at ECF 37.)  One month later, Plaintiff reported continued pain and that the ibuprofen did not help.  (Def.'s 56.1, Dkt. 47-4, ¶ 11; *see also* Dkt. 51-1, at ECF 33.)  Following a physical examination, he was prescribed stronger pain medication, advised to purchase more supportive footwear, and to apply ice to the plantar area of his foot three times a day.  (Def.'s 56.1, Dkt. 47-4, ¶ 11; *see also* Dkt. 51-1, at ECF 34.)

On July 20, 2011, Plaintiff reported level "8" pain in the plantar area of his left foot that was exacerbated when weight-bearing.  (Def.'s 56.1, Dkt. 47-4, ¶ 12; Dkt. 51-1, at ECF 26.)  Dr. Borecky examined Plaintiff, found "[g]ood circulation, no tenderness, [and] no mass" in the plantar area, requested x-rays, and advised Plaintiff to obtain pain medication from the commissary.  (Def.'s 56.1, Dkt. 47-4, ¶ 12; Dkt. 51-1, at ECF 25, 27–28.)  X-rays of Plaintiff's left foot and left knee resulted in "negative" findings and conclusions.[5]  (Def.'s 56.1, Dkt. 47-4, ¶ 13; *see also* Dkt. 51-1, at ECF 95, 97.)

---

[3]  "Plantar" refers to the sole of the foot.  *See* https://www.merriam-webster.com/dictionary/plantar (last visited Mar. 25, 2021).

[4]  Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[5]  The Court understands "negative" findings and conclusions to mean that the radiology report did not identify anything that would help to explain the symptoms reported by Plaintiff or otherwise cause concern.

On October 19, 2011, Plaintiff reported level "7" pain in his feet and left hip, and following a physical examination by an MLP, was prescribed ibuprofen.  (Def.'s 56.1, Dkt. 47-4, ¶ 14; Dkt. 51-1, at ECF 15–16.)  Several days later, on October 26, 2011, Plaintiff complained of pain that prevented his left hip from moving normally and made standing uncomfortable.  (Def.'s 56.1, Dkt. 47-4, ¶ 15; Dkt. 51-1, at ECF 10.)  Dr. Borecky ordered left hip x-rays, which resulted in "negative" findings and conclusions.  (Def.'s 56.1, Dkt. 47-4, ¶¶ 15–16; Dkt. 51-1, at ECF 87.)

On December 9, 2011, Plaintiff reported level "6" pain in his left foot and hip, and that ibuprofen did not help.  (Dkt. 51-1, at ECF 6.)  After conducting a physical examination, an MLP prescribed Indomethacin for pain, and advised Plaintiff to stay off his feet, avoid jumping from the top bunk, and apply cold compresses to the bottom of his left foot three to four times a day.  (Def.'s 56.1, Dkt. 47-4, ¶ 17.)  One month later, Plaintiff was examined by a physician's assistant ("PA") who advised him to purchase sneakers with better arch support for his "flat foot."  (*Id.* ¶ 18; Dkt. 51-2, at ECF 73–74.)

On January 30, 2012, Plaintiff complained that his left foot was still sore.  (Def.'s 56.1, Dkt. 47-4, ¶ 19.)  Following a physical examination, Dr. Borecky prescribed ibuprofen and ordered another left foot x-ray for comparison to the earlier x-ray.  (*Id.*)  The new x-ray revealed an "old bone defect" involving Plaintiff's toe, and no interval change.  (*Id.* ¶ 20.)  Over the next several months, Plaintiff reported wrist, neck, and lower back pain from an assault by another inmate, and complained of chronic pain in his left foot.  (*Id.* ¶¶ 21–23; Dkt. 51-2, at ECF 58.)  He was examined, prescribed pain medications, and advised to limit strenuous activity.  (*Id.*)

Then, on April 20, 2012, Plaintiff reported a "strange feeling" in his left buttock and left-foot pain when standing.  (Def.'s 56.1, Dkt. 47-4, ¶ 24.)  Dr. Borecky examined him, prescribed Tylenol, and ordered another left hip x-ray, noting: "INFORMED [PLAINTIFF] THAT I

4

REALLY FIND VERY LITTLE WRONG WITH HIM.  HIS EXAM IS ESSENTIALLY NEG[ATIVE].  THE LEFT TOE ABNORMALITY ON X-RAY DOES NOT BOTHER HIM." (*Id.*; Dkt. 51-2, at ECF 47.)  A left hip x-ray, taken on May 23, 2012, resulted in "negative" findings and conclusions.  (Def.'s 56.1, Dkt. 47-4, ¶ 25; Dkt. 51-2, at ECF 169.)

Two months later, on July 24, 2012, Plaintiff reported "sensation" in his left hip, level "5" pain in his left foot, especially with prolonged standing, and that medication did not help.  (Def.'s 56.1, Dkt. 47-4, ¶ 26; Dkt. 51-2, at ECF 14.)  Dr. Borecky prescribed ibuprofen and requested a consultation with a podiatrist, which the URC approved.  (Def.'s 56.1, Dkt. 47-4, ¶ 26.)  A podiatrist evaluated Plaintiff on November 27, 2012 and recommended an MRI and sneakers with extra cushion.  (*Id.* ¶ 27.)  Several weeks later, Plaintiff reported non-radiating pain in his left buttock.  (*Id.* ¶ 28.)  The PA who examined Plaintiff ordered an x-ray of Plaintiff's pelvis/coccyx, which resulted in "negative" findings and conclusions (Dkt. 51-2, at ECF 2, 153), and an MRI of Plaintiff's feet, which the URC approved (Def.'s 56.1, Dkt. 47-4, ¶ 29; Dkt. 51-2, at ECF 3; Dkt. 51-3, at ECF 91.).

On January 14, 2013, MRIs of Plaintiff's feet were done at New York Downtown ("NYDT") Hospital, and showed no evidence of faciitis,[6] acute fracture or dislocation, or a stress-related injury.  (Def.'s 56.1, Dkt. 47-4, ¶ 30; Dkt. 51-3, at ECF 88–89.)  Several weeks later, Plaintiff reported level "8" pain in his left big toe, upper chest and right shoulder, and decreased sleep.  (Def.'s 56.1, Dkt. 47-4, ¶ 31; Dkt. 51-3, at ECF 39.)  Dr. Borecky reviewed the MRI results, conducted a physical examination, revealing normal gait and stance, and minimal tenderness in

---

[6] "Fasciitis" refers to inflammation of the "connective tissue covering or binding together body structures."  *See* https://www.merriam-webster.com/dictionary/fasciitis (last visited Mar. 25, 2021); https://www.merriam-webster.com/dictionary/fascia (last visited Mar. 25, 2021).

Plaintiff's left big toe; prescribed acetaminophen; and requested a re-evaluation by a podiatrist, which the URC approved. (Def.'s 56.1, Dkt. 47-4, ¶¶ 31–32.)  On March 19, 2013, Plaintiff, who reported pain in his left big toe for the prior two years and tingling in the toes of his left foot, was evaluated by podiatrist Scott Herbert at Twin County Podiatry, P.C., who, after reviewing Plaintiff's medical history and conducting an examination, offered no specific diagnosis, but could not rule out sesamoid stress fractures, left foot neuroma pain, or neuropathy in the left foot.[7] (*Id.* ¶ 33; Dkt. 51-3, at ECF 72.)  Dr. Herbert discussed conservative and surgical options with Plaintiff and recommended a neurology evaluation. (Def.'s 56.1, Dkt. 47-4, ¶ 33; Dkt. 51-3, at ECF 72.)

In April and May 2013, Plaintiff received treatment for right ankle and finger injuries sustained while playing basketball; this treatment included an ankle x-ray, which resulted in "negative" findings and conclusions. (Def.'s 56.1, Dkt. 47-4, ¶¶ 34–37; Dkt. 51-3, at ECF 73.) There is no record of Plaintiff complaining of left-foot pain during these health services encounters. (*See* Dkt. 51-3, at ECF 24–25, 29–34.)

On June 14, 2013, Plaintiff was evaluated at the MDC based on his claim that "Dr. Fox" at NYDT Hospital had recommended a spine MRI.[8] (Def.'s 56.1, Dkt. 47-4, ¶ 38.)  During this evaluation, Plaintiff complained that his foot pain had traveled to his lower back, was exacerbated

---

[7] "Sesamoids are bones that develop within a tendon," most commonly in the foot and hand. *See* https://www.footcaremd.org/conditions-treatments/toes/sesamoid-injuries (last visited Mar. 25, 2021). Two sesamoids are typically found near the underside of the big toe, and pain from a sesamoid injury is focused under the big toe on the ball of the foot. *Id.* A "Neuroma," also referred to as a "pinched nerve," is a benign growth of nerve tissue frequently found between the third and fourth toes that causes pain, burning, tingling, or numbness between the toes and in the ball of the foot. *See* https://www.apma.org/neuromas (last visited Mar. 25, 2021). "Neuropathy" refers to weakness, numbness, and pain, usually in the hands and feet, that results from damage to peripheral nerves (*i.e.*, nerves outside of the brain and spinal cord). *See* https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061 (last visited Mar. 25, 2021).

[8] The Court notes that the records from NYDT Hospital do not refer to a "Dr. Fox" nor to any recommendation for a spine MRI. (*See* Dkt. 51-3, at ECF 88–89.)

when weight-bearing, but that he played basketball and ambulated without difficulty. (*Id.*) Approximately two months later, Plaintiff reported level "3" pain and that, if he did not play competitive sports, he had "very little pain," except for pain in his left foot, which made prolonged standing difficult. (*Id.* ¶ 39; Dkt. 51-3, at ECF 16.) Plaintiff also reported localized back pain that improved with yoga and stretching, but that ibuprofen did not alleviate, so he did not take it. (Def.'s 56.1, Dkt. 47-4, ¶ 39.) Dr. Borecky conducted a physical examination, prescribed acetaminophen, ordered a lumbar spine x-ray, and requested a neurology consultation. (*Id.* ¶¶ 39–40.) The x-ray of Plaintiff's lumbar spine resulted in "negative" findings and conclusions. (Dkt. 51-3, at ECF 70.)

**B.    Defendant and the URC Approve an Evaluation by a Neurologist and Deny an Immediate Evaluation by an Orthopedist**

On August 16, 2013, the URC, with Defendant's sign-off, approved the request for Plaintiff to be evaluated by a neurologist. (Def.'s 56.1, Dkt. 47-4, ¶ 41.) On October 30, 2013, Plaintiff received a neurological exam by Dr. Emmanuel A. Ofori, M.D., at Brooklyn Hospital Center. (*Id.* ¶ 42.) Dr. Ofori recorded Plaintiff's chief complaint as "a two-year history of left plantar pain and numbness," with pain that was sharp, intermittent, radiates to involve left buttock, worse with ambulation, and without any alleviating factors—"10/10" on the pain scale. (*Id.*; Dkt. 51-4, at ECF 51.) Dr. Ofori opined that Plaintiff's "left plantar pain [was] likely plantar fasciitis," and recommended Indomethacin, foot support, and an orthopedic evaluation. (Def.'s 56.1, Dkt. 47-4, ¶ 42; Dkt. 51-4, at ECF 52.) Attending Physician Jonathan Peck, M.D., Ph.D recorded his impressions of Plaintiff's condition as "plantar pain, worse when walking, no weakness, no sensory loss to touch, vibration, or temperature," and noted "will try indometh[acin], foot supports[,] ortho." (Def.'s 56.1, Dkt. 47-4, ¶ 43; Dkt. 51-4, at ECF 52.)

Two days after the neurology consultation, Plaintiff was examined at the MDC by a family nurse practitioner ("FNP") who recorded his pain level as "0," and found Plaintiff to have a normal gait and full range of motion in his ankle, foot, and toes.  (Def.'s 56.1, Dkt. 47-4, ¶ 44; Dkt. 51-3, at ECF 3–4.)  The FNP noted that the "[p]lan of care" included medication, "PT for foot support," and an "orthopedic evaluation," that the provisional diagnosis "per Neuro consultation" was "likely plantar fasciitis," and that Plaintiff needed an "evaluation for foot support."  (Def.'s 56.1, Dkt. 47-4, ¶ 44; Dkt. 51-3, at ECF 3–4.)

On November 8, 2013, the URC, with Defendant's sign-off, considered the request for Plaintiff to be evaluated by an orthopedist and determined that, "[a]t the present time[,] conservative treatment [is] to be continued along with periodic evaluation," but that Plaintiff would "be re-evaluated and [that] re-submission of the request [would] be considered if medically indicated."  (Def.'s 56.1, Dkt. 47-4, ¶ 45; Dkt. 51-3, at ECF 69.)  Defendant and the URC made this determination based on the October 30, 2013 neurology consultation records of Drs. Ofori and Peck, and the diagnosis of plantar fasciitis.  (Def.'s 56.1, Dkt. 47-4, ¶ 46.)  Defendant concluded that, in his medical judgment and following the standard of care for plantar fasciitis, Plaintiff should start with conservative treatment, including medication, stretching, and avoiding exacerbating activities, before being referred for an orthopedic consultation.  (*Id.*)  Then, "[i]f conservative treatment was not successful, Plaintiff would be re-evaluated to determine whether an [] outside [orthopedic] consultation was medically necessary."  (*Id.*)

### C.    Plaintiff's Medical History After He was Denied an Immediate Evaluation by an Orthopedist

On November 21, 2013, several weeks after the URC's decision, Plaintiff reported level "10" pain radiating down his left leg to his foot, and asked about the status of his physical therapy referral.  (Def.'s 56.1, Dkt. 47-4, ¶ 47.)  An FNP conducted a physical examination, finding that

Plaintiff had a normal gait and full range of motion in his ankle, foot, and toes, and informed Plaintiff that his physical therapy was pending scheduling.  (*Id.*; Dkt. 51-3, at ECF 1–2.)

Several months later, on February 25, 2014, Plaintiff reported level "0" pain, was informed that his orthopedic consultation was not approved, and was issued arch supports.  (Def.'s 56.1, Dkt. 47-4, ¶ 48; Dkt. 51-4, at ECF 27.)  On April 6, 2014, Plaintiff reported sore calves (level "3" pain) from "doing exercises on the stairs, something like toe raises," and offered no other medical complaints.  (Def.'s 56.1, Dkt. 47-4, ¶ 49; *see* Dkt. 51-4, at ECF 23.)  A registered nurse conducted a physical examination and prescribed ibuprofen.  (Def.'s 56.1, Dkt. 47-4, ¶ 49.)  On August 21, 2014, Plaintiff complained of level "5" pain in his lower back and left foot that made it difficult to sleep, but reported that he was not taking medication and was doing around 15 push-ups each day.  (*Id.* ¶ 50; Dkt. 51-4, at ECF 17.)  Following a physical examination by an MLP revealing normal gait, lumbar spine spasm and tenderness, joint pain, and low back pain, Plaintiff was prescribed Amitriptyline for low back pain.  (Def.'s 56.1, Dkt. 47-4, ¶ 50; Dkt. 51-4, at ECF 19.)

On September 12, 2014, Plaintiff complained of level "10" "pain radiating down the left side of his body to the top of his left foot," and reported that an "inmate doctor" had told him "that he might have back trouble radiating to his left foot."  (*Id.* ¶ 52; Dkt. 51-4, at ECF 5.)  Dr. Borecky noted that the neurologist's prior diagnosis of plantar fasciitis was no longer correct, as Plaintiff now complained of pain on the left side of his body and the *top*, not bottom, of his foot.  (Def.'s 56.1, Dkt. 47-4, ¶ 52.)  Following a physical examination, Dr. Borecky ordered spine x-rays and renewed Plaintiff's Amitriptyline prescription.  (*Id.*)  The x-rays of Plaintiff's thoracic, cervical, and lumbar spine resulted in "negative" findings and conclusions.  (*Id.* ¶ 53; Dkt. 51-4, at ECF 53, 54, 56.)

On November 18, 2014, Defendant separated from his employment at the MDC.  (Def.'s 56.1, Dkt. 47-4, ¶ 5.)  At no point during his employment at the MDC did Defendant provide medical care to Plaintiff.  (*See* Edwin Decl., Dkt. 47-3, ¶ 6.)

### D.    Plaintiff's Medical History After Defendant Separated from Employment at the MDC

On December 8, 2014, Plaintiff reported level "5" pain in his left foot and lower back that was exacerbated by standing or walking.  (Def.'s 56.1, Dkt. 47-4, ¶ 58; Dkt. 51-4, at ECF 1.)  The MPL who evaluated Plaintiff noted that he appeared to be in pain during the examination, and assessed low back pain.[9]  (Def.'s 56.1, Dkt. 47-4, ¶ 58.)  A month later, on January 6, 2015, Plaintiff complained to Dr. Borecky that he was not better and needed an MRI.  (*Id.* ¶ 60.)  Dr. Borecky noted that Plaintiff "moved normally" and advised Plaintiff that the consulting neurologists had not recommended any additional MRIs.  (*Id.*)  Several days later, following a complaint by Plaintiff's attorney, Dr. Borecky requested a follow-up neurology consultation, which was approved by the URC.  (*Id.* ¶¶ 61–62.)

On February 18, 2015, Plaintiff, whose "chief complaint" was neuropathy and who reported level "10" intermittent lower back pain,[10] was evaluated by Dr. Daniel Rosenbaum, a neurologist at Brooklyn Hospital Center, who assessed neuropathy due to a possible herniated disc,

---

[9] From September through December 2014, Plaintiff was marked "no show" for medication a total of 61 times.  (Def.'s 56.1, Dkt. 47-4, ¶¶ 54–57.)  Plaintiff states that the medication was ineffective.  (Plaintiff's Response to Defendant's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Pl.'s 56.1 Resp."), Dkt. 48-1, ¶¶ 54–57.)  On December 8, 2014, Plaintiff signed a Medical Treatment Refusal form, refusing Amitriptyline at bedtime to treat his chronic left foot and lower back pain, and indicating that he was advised that his pain condition would not improve if he did not take his medication.  (Def.'s 56.1, Dkt. 47-4, ¶ 59; Dkt. 51-4, at ECF 47.)

[10] Plaintiff's medical records do not indicate whether he reported level "10" pain in his foot, leg, back, or other location.

ordered a spine MRI, and prescribed Gabapentin.  (Def.'s 56.1, Dkt. 47-4, ¶ 65; Dkt. 51-5, at ECF 143–45.)  Dr. Rosenbaum did not refer Plaintiff to an orthopedist.  (Def.'s 56.1, Dkt. 47-4, ¶ 65; *see* Dkt. 51-5, at ECF 143–45.)  Two days later, Plaintiff reported level "8" pain in his lower back when he met with nurse practitioner ("NP") Brian Gerson at the MDC to discuss treatment plans.  (Def.'s 56.1, Dkt. 47-4, ¶ 66; Dkt. 51-5, at ECF 36.)  After conducting a physical examination, NP Gerson assessed low back pain, nerve pain, neuralgia neuritis, and radiculitis, and Dr. Borecky ordered Gabapentin.  (Def.'s 56.1, Dkt. 47-4, ¶ 67.)  NP Gerson noted that Plaintiff "jump[ed] up on the exam table without any effort," and did "not objectively appear to have the common symptoms often observed with someone who[] is in great pain."[11]  (*Id.* ¶ 66; Dkt. 51-5, at ECF 36.)  On May 26, 2015, Plaintiff had a lumbar spine MRI that revealed, *inter alia*, "[m]ild disc bulge[12] at L5/S1 with mild neural foraminal narrowing bilaterally however without central canal stenosis.[13]"  (Def.'s 56.1, Dkt. 47-4, ¶ 69; Dkt. 51-1, at ECF 132.)

---

[11]  In his response to Defendant's 56.1 Statement, Plaintiff "does not object to this information," but notes that his ability to "mobilize without any difficulty does not dispute the fact that [P]laintiff was in pain."  (Pl.'s 56.1 Resp., Dkt. 48-1, ¶ 66.)  The Court does not discount that Plaintiff was, in fact, in pain during this appointment, but finds NP Gerson's observations to also provide a helpful perspective on Plaintiff's condition at that time.

[12]  A "disk" provides cushioning between the vertebrae of the spine and is composed of an outer layer of tough cartilage surrounding a center of softer cartilage.  *See* https://www.mayoclinic.org/diseases-conditions/herniated-disk/expert-answers/bulging-disk/faq-20058428 (last visited Mar. 25, 2021).  A "bulging disk" is different than a "herniated disk."  The former usually affects only a quarter to a half of the tough cartilage on the outside of a disk, while the latter is caused when a crack in the tough outer layer of the cartilage allows some of the softer inner cartilage to protrude.  *Id.*  "Compared with a bulging disk, a herniated disk is more likely to cause pain because it generally protrudes farther and is more likely to irritate nerve roots."  *Id.*

[13]  "Foramen" refers to openings in the bones of the spine that "allow the nerves branching from the spinal cord to travel to the arms, legs, and other parts of the body."  *See* https://www.cedars-sinai.org/health-library/diseases-and-conditions/f/foraminal-stenosis.html (last visited Mar. 25, 2021).  The bones of the spine also have a large central opening for the spinal cord.  *Id.*  "Stenosis" refers to the clogging of the foramen and/or central opening by bony spurs that develop due to age or conditions like arthritis.  *Id.*

On June 19, 2015, Plaintiff complained of level "9" pain in "[m]ultiple [l]ocations," reported a history of left foot pain for the prior four years, and lumbar spine pain for the prior two years that radiated from his lumbar spine on the right side to his right foot,[14] and that was exacerbated by prolonged sitting or standing, and physical activity. (*Id.* ¶ 70; Dkt. 51-5, at ECF 28.) PA Bridget Baker examined Plaintiff, noting lumbar spine tenderness, full range of motion, and that Plaintiff reported that he was not responding to "several medications" and was currently not taking any medications. (Def.'s 56.1, Dkt. 47-4, ¶ 70; Dkt. 51-5, at ECF 29–30.) PA Baker requested a consultation for orthotics and a follow-up with a neurologist. (Def.'s 56.1, Dkt. 47-4, ¶ 70; Dkt. 51-5, at ECF 30.)

On September 3, 2015, Plaintiff had a follow-up evaluation with NP Gerson and reported that his pain, which was unchanged since 2010, was intermittent, ranging from "0" to "10," sharp, tingling, and shooting from his ribs and lower back to his left foot. (Def.'s 56.1, Dkt. 47-4, ¶ 71.) Plaintiff complained that, although he was ambulatory and able to jog, he could barely complete ten pushups due to pain. (*Id.*) Plaintiff agreed that, given "his ability to perform his activities of daily living and his levels [and frequency] of pain," surgery was not the best option at that time. (*Id.* ¶ 72.) Instead, he would try higher doses of Elavil and Gabapentin and, if the pain persisted, undergo re-evaluation for treatment options, including by a neurologist. (*Id.*)

Several days later, on September 8, 2015, Plaintiff had an "ortho consultation visit" at Hanger Prosthetics, where he was fitted for "extra depth shoes" and a back brace for his spinal pain. (*Id.* ¶ 73; Dkt. 51-5, at ECF 19.) This orthotics consultation appears to have been based on

---

[14] The Court notes that, although Plaintiff's medical records generally refer to pain in Plaintiff's left foot, this record refers to pain radiating from the right side of his back down to his right foot. (Dkt. 51-5, at ECF 28.)

the request made by PA Baker on June 19, 2015.  (*See* Dkt. 51-5, at ECF 30.)  There is no record of the URC approving this request for an outside consultation.

On September 22, 2015, Plaintiff, who reported pain, tingling, and numbness in his left foot, left leg, left buttock, and back, was examined by Dr. Mona Alipour, M.D., a neurologist at the Brooklyn Hospital Center.  (Def.'s 56.1, Dkt. 47-4, ¶ 74.)  Dr. Alipour reviewed Plaintiff's spine MRI, assessed left leg pain secondary to disc bulging, and recommended increasing the dosage of Gabapentin, a neurology and physical therapy consultation, and follow-up in two weeks. (*Id.*)  Dr. Alipour did not refer Plaintiff to an orthopedist.  (*Id.*)  On December 3, 2015, Plaintiff, who reported pain radiating from his back to his left foot for the prior four years and level "10" pain[15] upon examination, was evaluated by Dr. Marc Ross, M.D.[16] to assess for the need for physical and occupational therapy.  (*Id.* ¶ 76; Dkt. 51-5, at ECF 122.)  Dr. Ross recommended an electromyography (EMG) study, bi-weekly physical therapy, and changing Plaintiff's medication to Lyrica.  (Def.'s 56.1, Dkt. 47-4, ¶ 74; Dkt. 51-5, at ECF 122.)  Dr. Ross did not refer Plaintiff to an orthopedist.  (Def.'s 56.1, Dkt. 47-4, ¶ 74; *see* Dkt. 51-5, at ECF 122.)

On December 17, 2015, Plaintiff was issued orthopedic shoes and inserts.  (Def.'s 56.1, Dkt. 47-4, ¶ 77.)  Shortly after, he was transferred from the MDC to USP Hazelton (*id.* ¶ 4), where he continued to complain of radiating low back pain and sought a neurosurgery consultation for several months (Dkt. 51-6, at ECF 7, 31, 45, 55, 56, 61, 105).  On December 16, 2016, Plaintiff underwent an EMG study that concluded there was no evidence of peripheral neuropathy or left lumbosacral radiculopathy.  (Def.'s 56.1, Dkt. 47-4, ¶ 79.)

---

[15] Though it is not clear from Plaintiff's medical records, it appears that Plaintiff reported that this pain was located in his back.  (*See* Dkt. 51-5, at ECF 122.)

[16] Dr. Marc K. Ross specializes in physical medicine and rehabilitation.  *See* https://www.kingsbrook.org/About-Us/Meet-Our-Staff/Chairs-of-Service/Marc-Ross-M-D-.aspx (last visited Mar. 25, 2021).

## II.        Procedural History

On May 30, 2017, Plaintiff filed the instant action *pro se* against Defendant and Dr. Borecky, alleging Fifth and Eighth Amendment violations in connection with his medical treatment at MDC.  (*See generally* Compl., Dkt. 1.)  On June 12, 2018, the Court granted Defendants' motion to dismiss Dr. Borecky,[17] but denied the motion as to Defendant Edwin, finding that Plaintiff "allege[d] sufficient facts to sustain his claim that [Defendant]'s denial of Plaintiff's referral for an orthopedic consultation constituted deliberate indifference." *See Laurent*, 2018 WL 2973386, at *3.  The Court held that Plaintiff's deliberate indifference claim arose under the Due Process Clause of the Fifth Amendment rather than the Eighth Amendment (since Plaintiff was a pre-trial detainee and not a convicted defendant), that a *Bivens* action was cognizable in this context,[18] and that Defendant was not entitled to qualified immunity at that time. *Id.* at *4–6.  The parties completed discovery and filed summary judgment briefs on February 18, 2020.  (Dkts. 47, 48, 53.)

In support of summary judgment, Defendant principally argues that the decision to pursue more conservative treatment, rather than immediately refer Plaintiff for an evaluation by an orthopedist, was based on sound medical judgment, and, as a matter of law, does not show a

---

[17] The Court granted the motion as to Dr. Borecky because Plaintiff failed to make "a single allegation to substantiate his deliberate indifference claim as to Dr. Borecky" and did "not identif[y] a particular failure by Dr. Borecky." *Laurent*, 2018 WL 2973386, at *3 (citation omitted).

[18] As addressed more fully in the June 12, 2018 Memorandum and Order, the Court reasoned that this case could be distinguished from *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), in which the Supreme Court declined to extend a *Bivens* remedy, because Plaintiff's claim of deliberate indifference to serious medical needs "bears an extremely strong 'resemblance to [one of] the three *Bivens* claims the [Supreme] Court has approved in the past: . . . a claim against prison officials for failure to treat an inmate's asthma,'" and therefore did not allege a "new *Bivens* context." *Laurent*, 2018 WL 2973386, at *5 (citation omitted.)

sufficiently culpable state of mind to constitute deliberate indifference. (Memorandum of Law in Support of Defendant's Motion for Summary Judgment, Dkt. 47-1, at 11–16.) In opposition, Plaintiff argues that Defendant acted with deliberate indifference when he "deliberately overlooked [] medical records" documenting Plaintiff's "constant complaints of pain," history of ineffective treatments, and erroneous diagnosis of fasciitis, and that he "knowingly denied an outside specialist recommendation for [P]laintiff to be examined by someone who c[ould] possibly provide a more effective plan of care and/[or other referral] to remedy [Plaintiff's] condition[.]" (Plaintiff's Opposition Brief ("Pl.'s Opp'n."), Dkt. 53, at ECF 3, 13–14.)

In support of his argument that Defendant deliberately failed to provide him with adequate treatment and a correct diagnosis, Plaintiff points to letters from Dr. Paula Lewis, a physician in Internal Medicine, who cared for Plaintiff *prior* to his incarceration.[19] (*Id.* at ECF 7–8; *see* Dkt. 53-1, at ECF 2–3.) In a letter dated August 6, 2014, Dr. Lewis explained that although she had not examined Plaintiff, she had received a letter from him reporting persistent back and foot pain, and that the MRI of his foot and evaluation by doctors had not resulted in any diagnosis. (Dkt. 53-1, at ECF 2.) In response, Dr. Lewis "strongly suggest[ed]" an MRI of Plaintiff's lumbar spine to determine if a herniated disc was to blame for both the back and foot pain, as well as a "second opinion from doctors outside of the prison facility[.]" (*Id.*) In her May 28, 2015 letter, Dr. Lewis again noted that she had not examined Plaintiff, but that based on his persistent complaint of low back pain, she strongly recommended a lumbar spine MRI without contrast to identify possible

---

[19] It does not appear from Dr. Lewis's letters, nor does Plaintiff argue, that Dr. Lewis ever examined or treated Plaintiff with respect to the symptoms and complaints that are at issue in this case, namely persistent pain in his foot and lower back. (*See* Dkt. 53-1, at ECF 2–3.) It also does not appear that Defendant or the members of the URC ever received or reviewed Dr. Lewis's letters. (*Id.*)

"lumbar spinal stenosis or intervertebral disc herniation of the spine," neither of which would show up on a routine x-ray and could lead to permanent neurologic damage if not properly diagnosed. (Dkt. 53-1, at ECF 3.)  In addition to citing Dr. Lewis's letters, Plaintiff also appears to point to the "ortho consult" he eventually received at a Prosthetics Clinic as evidence that he should have been seen for an orthopedic consult all along.  (Pl.'s Opp'n., Dkt. 53, at ECF 4–5, 8.)

In his reply, Defendant argues that the letters from Dr. Lewis are "inapposite" to Plaintiff's claims against Defendant, as the August 6, 2014 letter was received approximately nine months *after* the URC's decision to pursue conservative treatment, rather than an immediate orthopedic consult, and the May 28, 2015 letter was received after Plaintiff had already undergone a lumbar spine MRI.  (Memorandum of Law in Reply and in Further Support of the Defendant's Motion for Summary Judgment, Dkt. 49, at 4.)  Moreover, neither letter recommended that, based on Plaintiff's complaints, he should receive an orthopedic consultation.  (*Id.*)

## LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The initial "burden of establishing the absence of any genuine issue of material fact" rests with the moving party.  *Zalaski v. Cty. of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Once this burden is met, however, the burden shifts to the non-moving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial.  *Spinelli v. City of New York*, 579 F.3d 160, 166–67

(2d Cir. 2009) (citation omitted); *see also Celotex*, 477 U.S. at 322–23.  A "mere scintilla of evidence" in support of the non-moving party is insufficient; rather, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alteration in original) (quoting *Anderson*, 477 U.S. at 252).  When assessing whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  The Court also construes any disputed facts in the light most favorable to the non-moving party.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

In considering a dispositive motion brought or defended by a *pro se* litigant, the Court must "liberally construe[]" the *pro se* party's pleadings in his favor and hold him to "less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9–10 (1980) (internal quotation marks, citation, and ellipsis omitted); *see also Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) ("[The Second Circuit] liberally construe[s] pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." (internal quotation marks and citations omitted)).  Nonetheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (internal quotation marks and citation omitted).

## DISCUSSION

Notwithstanding the Court's sympathy for Plaintiff's frustration and suffering over what he describes as "a vicious cycle of consistent misdiagnosis and treatment" (Pl.'s Opp'n, Dkt. 53,

at ECF 8), the Court finds that no reasonable juror could conclude that Defendant acted with deliberate indifference by participating in, and signing off on, the URC's decision to deny Plaintiff an orthopedic evaluation in November 2013.    Therefore, Defendant's motion for summary judgment is granted.

## I.    Defendant's Personal Involvement in the Alleged Constitutional Violation

In its prior decision, the Court permitted Plaintiff to proceed with his *Bivens* claims based on allegations from which Defendant's deliberate indifference could be plausibly inferred with respect to the URC's November 2013 decision denying Plaintiff an immediate orthopedic consultation.    *Laurent*, 2018 WL 2973386, at *4–5.    A *Bivens* claim is brought against an individual "for his or her own acts, not the acts of others," including those of subordinates.    *See Ziglar*, 137 S. Ct. at 1860; *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."); *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("[A]fter *Iqbal*, there is no special rule for supervisory liability.    Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" (quoting *Iqbal*, 556 U.S. at 676)).    The only allegation against Defendant relates to his personal involvement and direct participation in the URC's decision to deny the orthopedic consultation.[20]    (Compl., Dkt. 1, at ECF 9 ("I received on November 8[,] 2013 a notice from the URC[] in which Clinical Director Robin Edwin denied my referral for orthopedic consultation

---

[20] In his opposition brief, Plaintiff argues that "[f]or Dr. Edwin as chair of the URC to sign off on an approval for consult yet not follow through to ensure his medical associates carry out the treatments prescribed shows a dereliction of responsibilities."  (Pl.'s Opp'n., Dkt. 53, at ECF 6.)  However, because Plaintiff alleges no facts nor provides any evidence to support this conclusory assertion, the Court finds it insufficient to overcome Defendant's motion for summary judgment.  *See Rodriguez*, 209 F. Supp. 2d at 348.  Moreover, to the extent Plaintiff attempts to plead a claim based on supervisory liability, such a claim fails as a matter of law.  *See Tangreti*, 983 F.3d at 618.

without explanation[.]").  Therefore, the sole question before the Court is whether Defendant is entitled to summary judgment on Plaintiff's claim that Defendant's participation in, and sign-off on, the URC's November 2013 decision denying Plaintiff an orthopedic consultation at that time amounted to deliberate indifference.

## II.        Due Process Clause of the Fifth Amendment

The Eighth Amendment does not apply to individuals who are detained pre-trial as they "have not been convicted of a crime and thus 'may not be punished in any manner—neither cruelly and unusually nor otherwise.'"  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted).  Instead, the rights of a pre-trial federal detainee, which are "at least as great as the Eighth Amendment protections available to a convicted prisoner," *id.* (internal quotation marks omitted) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)), arise under the Due Process Clause of the Fifth Amendment, *see Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000); *Vargas v. City of New York*, No. 13-CV-3188 (SLT), 2017 WL 1214434, at *11 (E.D.N.Y. Mar. 31, 2017).  At the time of Plaintiff's allegations against Defendant, Plaintiff was housed at the MDC awaiting trial.  (*See* Def.'s 56.1, Dkt. 47-4, ¶¶ 1–3.)  Accordingly, his claims arise under the Due Process Clause of the Fifth Amendment.

Courts in the Second Circuit apply a two-prong test to claims of inadequate medical care under the Due Process Clause of the Fifth Amendment.  The plaintiff must show that (1) he has a serious medical need, and (2) the defendant acted with deliberate indifference to that need.  *See Coronel v. Decker*, 449 F. Supp. 3d 274, 282 (S.D.N.Y. 2020) (citing *Charles v. Orange County*, 925 F.3d 73, 85–86 (2d Cir. 2019)); *Cuoco*, 222 F.3d at 106 (2d Cir. 2000).[21]

---

[21] This analysis is co-extensive with the analysis applied to pre-trial state detainees' claims arising under the Due Process Clause of the Fourteenth Amendment.  *Darnell*, 849 F.3d at 21 n.3 ("To suppose that 'due process of law' meant one thing in the Fifth Amendment and another in

### A.    Serious Medical Need

The standard for serious medical need "contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles*, 925 F.3d at 86 (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).  Courts

> consider factors such as whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects an individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain.  In most cases, the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm.

*Id.*  (citations omitted).  When plaintiff is receiving ongoing treatment, but complains of an unreasonable delay in that treatment, "the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (internal quotation marks and citation omitted); *accord Mena v. City of New York*, No. 13-CV-2792 (NGG) (SJB), 2018 WL 4328827, at *6 (E.D.N.Y. Sept. 11, 2018).

Plaintiff's medical records demonstrate that, between April 2011 and November 2013, when the URC denied Plaintiff's request for an orthopedic consultation (which had been recommended by the consulting neurologists, Drs. Ofori and Peck, on October 30, 2013), Plaintiff had repeatedly complained of pain in his left foot, hip, buttock, and/or lower back, and that he often rated his left-side lower back, hip and foot pain as greater than "5," especially when standing, weight-bearing, or ambulating.  (*See supra* Sections I.A, I.B.)  In response to Plaintiff's complaints during this time period, MDC health services staff examined Plaintiff; prescribed him various medications for pain relief; ordered MRIs of his feet and x-rays of his feet, hip, pelvis/coccyx, and

---

the Fourteenth is too frivolous to require elaborate rejection." (quoting *Malinski v. New York*, 324 U.S. 401, 415 (1945) (Frankfurter, J., concurring))).

spine; and requested consultations with outside specialists, including podiatrists and a neurologist. (*See supra* Sections I.A, I.B.)   In the years that followed, Plaintiff continued to complain, intermittently, of lower back pain radiating down to his left foot, which prompted MDC health services staff to prescribe different and additional pain medications; order imaging and diagnostic testing, including a spine MRI and EMG study; and request consultations in neurology and physical therapy.  (*See supra* Sections I.C, I.D.)  Although the records do not indicate that Plaintiff received a single conclusive diagnosis, over the years, he was assessed by various medical professionals and specialists as having plantar fasciitis, back pain, leg pain, nerve pain, and a mild disc bulge without central canal stenosis.  (*See supra* Sections I.A–I.D.)

Regarding the "serious medical need" element of Plaintiff's due process claim, the Court finds that this evidence, viewed in the light most favorable to Plaintiff, raises a genuine dispute as to whether a reasonable doctor or patient would find Plaintiff's complaints "worthy of treatment," whether his "medical condition significantly affect[ed] [his] daily activities," and whether he experienced "chronic and substantial pain."  *See Charles*, 925 F.3d at 86 (citing *Chance*, 143 F.3d at 702); *see also Rosario v. Anson*, No. 12-CV-1506 (BKS) (CFH), 2015 WL 5692550, at *10 (N.D.N.Y. Sept. 28, 2015) (finding a genuine dispute as to whether plaintiff's knee pain, for which he repeatedly complained and sought medical care, caused chronic pain and affected his daily activities); *Benjamin v. Kooi*, No. 07-CV-506 (LEK) (DRH), 2010 WL 985844, at *7 (N.D.N.Y. Feb. 25, 2010) (finding a genuine dispute where plaintiff "complained of back pain and migraines for more than a year and his CT scan showed evidence of a degenerative disc disease" (record citations omitted)), *report and recommendation adopted*, 2010 WL 985823 (N.D.N.Y. Mar. 17, 2010); *Flemming v. City of New York*, No. 03-CV-662 (NGG) (LB), 2009 WL 3174060, at *8, n.9 (E.D.N.Y. Sept. 30, 2009) ("Depending on the circumstances, severe back pain may qualify as a

'serious medical need.'" (collecting cases)).  Accordingly, the Court concludes that a reasonable juror could find that Plaintiff's condition rose to the level of a serious medical need.[22]

### B.    Deliberate Indifference

Deliberate indifference is established by showing that a defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [defendant] knew, or should have known, that the condition posed an excessive risk to health or safety."  *Darnell*, 849 F.3d at 35; *see also Charles*, 925 F.3d at 87; *Coronel*, 449 F. Supp. 3d at 284.  "A detainee must prove that an official acted intentionally or recklessly, and not merely negligently."  *Darnell*, 849 F.3d at 36; *see also Charles*, 925 F.3d at 87 ("[M]ere medical malpractice is not tantamount to deliberate indifference[.]" (citation omitted)); *Lara-Grimaldi v. County of Putnam*, No. 17-CV-622 (KMK), 2018 WL 1626348, at *6 (S.D.N.Y. Mar. 29, 2018) ("Despite the slightly lower standard articulated in *Darnell*, which is akin to objective recklessness, any [deliberate indifference] claim for a violation of due process requires proof of a mens rea greater than mere negligence." (internal quotation marks and citation omitted)).

"A claim based on an inmate's disagreement with the defendant['s] medical judgment as to the proper course of treatment cannot support a constitutional claim for deliberate indifference."

---

[22] The Court acknowledges that courts have found plantar fasciitis and other complaints of foot pain to be insufficiently serious.  *See Grubbs v. Grimaldi*, No. 16-CV-1476 (TJM) (DJS), 2019 WL 720969, at *8 (N.D.N.Y. Jan. 23, 2019) (collecting cases), *report and recommendation adopted*, 2019 WL 719383 (N.D.N.Y. Feb. 20, 2019); *Park v. City of New York*, No. 10-CV-9627 (DLC), 2011 WL 5865083, at *4 (S.D.N.Y. Nov. 22, 2011) (same).  However, the Court does not find these cases persuasive here because Plaintiff's condition defied a single diagnosis, and he complained of and received treatment for a constellation of pain symptoms involving his foot, hip, buttock, and back over a period of several years.  Indeed, as discussed above, based on the evidence in the record, a jury could conclude that Plaintiff's medical condition went beyond foot pain and plantar fasciitis, and involved a mild disc bulge and other spinal impairments.

*Mena*, 2018 WL 4328827, at *5 (citing *Simpson v. Oakes*, 640 F. App'x 86, 88 (2d Cir. 2016) (summary order)).  And it is generally understood that "the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference."  *Jacks v. Annucci*, No. 18-CV-3291 (KMK), 2019 WL 3239256, at *4 (S.D.N.Y. July 18, 2019) (citations omitted); *see Smalls v. Wright*, 807 F. App'x 124, 126 (2d Cir. 2020) (summary order) ("[Defendant]'s decisions not to order an MRI and not to refer [plaintiff] to a specialist constitute matters of medical judgment that do not give rise to [a constitutional] violation.")

However, "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan," as evident when treatment recommendations are not derived from "sound medical judgment," but "ulterior motives."  *See Chance*, 143 F.3d at 703–04 (holding that plaintiff stated a claim of deliberate indifference by alleging that defendants recommended extracting his teeth because of monetary incentives); *cf. Mena*, 2018 WL 4328827, at *7 (granting summary judgment upon finding, *inter alia*, no evidence "suggesting that any of the[] Individual Defendants failed to refer Plaintiff to an orthopedic specialist because of financial concerns").  Ultimately, "[w]hether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case."  *Chance*, 143 F.3d at 703.

At issue here is Defendant's participation in and sign-off on the URC's November 8, 2013 decision to have Plaintiff continue with "conservative treatment" and "periodic evaluation," rather than see an orthopedist at that time.  (Dkt. 51-3, at ECF 69.)  Defendant and the URC arrived at this treatment decision after reviewing medical records from the October 30, 2013 neurology consultation, which noted Plaintiff's two-year history of left plantar foot pain and numbness

radiating to his left buttock, offered a diagnosis of plantar fasciitis, and recommended an orthopedic consultation.  (*See* Edwin Decl., Dkt. 47-3, ¶ 9; Def.'s 56.1, Dkt. 47-4, ¶ 42.) Defendant, as part of the URC, agreed that, based on the standard of care for treating plantar fasciitis, Plaintiff should start with "medication, stretching exercises[,] and avoiding exacerbating activities, as a first step . . . , along with re-evaluation to determine whether an additional outside consultation was necessary."  (Edwin Decl., Dkt. 47-3 ¶ 9.)

Plaintiff contends that, in agreeing with and signing off on the URC's decision to opt for conservative treatment in the first instance, Defendant acted out of an ulterior motive not to provide Plaintiff necessary treatment because it was "too much."  (Pl.'s Opp'n, Dkt. 53, at ECF 7–8 (arguing that the URC's decision was tantamount to concluding that "we know the problem but the solution is too much," and that "a consistent, conscious effort was used at every front to stop adequate treatment from being pursued and provided")); *see Chance*, 143 F.3d at 703; *Mena*, 2018 WL 4328827, at *7.  However, there is nothing in the record to support this conclusion.  Rather, the undisputed evidence shows that Defendant, together with the URC, engaged in a deliberative process in which they reviewed Plaintiff's medical records and considered the standard of care associated with plantar fasciitis before arriving at a treatment recommendation based on an exercise of medical judgment.  Moreover, the URC's November 8, 2013 decision was not made in a vacuum.  Two months earlier, on August 13, 2013, Defendant, together with the URC, reviewed Plaintiff's medical records, including negative MRIs of Plaintiff's feet and negative x-rays of Plaintiff's spine, coccyx, and pelvis, as well as Plaintiff's complaints of non-radiating back pain and an inability to stand on his left foot for prolonged periods of time, and approved "Plaintiff for a neurology consultation to gather further information about a possible diagnosis and to determine whether any additional tests or imaging were necessary."  (Edwin Decl., Dkt. 47-3, ¶ 7.)  In short,

this is not a case where Defendant reflexively denied Plaintiff treatment or deliberately ignored treatment recommendations without reviewing and considering Plaintiff's medical history.  *See Johnson v. Wright*, 412 F.3d 398, 404–06 (2d Cir. 2005).  The contention that Defendant was motivated to provide anything other than what he believed to be medically appropriate treatment is belied by the URC's decision to refer Plaintiff to a neurologist on August 13, 2013 and the numerous x-rays, MRIs, and specialist consultations that Plaintiff received both before and after November 8, 2013.

Further, Defendant's treatment recommendation does not amount to deliberate indifference simply because it deviated, at least in terms of timing, from Drs. Ofori's and Peck's recommendation for an orthopedic consultation.  *Williams v. Smith*, No. 02-CV-04558 (DLC), 2009 WL 2431948, at *9 (S.D.N.Y. Aug. 10, 2009) ("[A] prison doctor who relies on his medical judgment to modify or disagree with an outside specialist's recommendation of how to treat an inmate is not said to act with deliberate indifference." (citations omitted)); *see Allah v. Switz*, No. 14-CV-5970 (KMK), 2017 WL 519269, at *7 (S.D.N.Y. Feb. 8, 2017) ("[D]isagreements among treating medical professionals do not create an inference of deliberate indifference." (collecting cases)); *see also Rush v. Canfield*, No. 13-CV-191 (S) (M), 2015 WL 12991158, at *6–7 (W.D.N.Y. Jan. 6, 2015) (recommending grant of summary judgment to defendants who altered plaintiff's previous course of treatment for back pain because "[n]ot every physician will treat every ailment in exactly the same manner[] [and] [t]hat does not mean that one of the physicians must be acting with deliberate indifference to the patient's needs"), *aff'd*, 649 F. App'x 70 (2d Cir. 2016) (summary order); *Green v. Misa*, No. 09-CV-1106, 2013 WL 2458775, at *9 (W.D.N.Y. June 6, 2013) (granting summary judgment to defendant because "deliberate indifference does not exist where one doctor recommends surgery while a different doctor concludes surgery is not

warranted unless more conservative measures such as physical therapy have not been proven effective" (citation omitted)).  Moreover, given Plaintiff's medical history and records as of November 8, 2013, which included numerous negative MRIs and x-rays, no reasonable jury could find that Defendant's and the URC's decision not to immediately refer Plaintiff for an orthopedic consultation, despite Drs. Ofori's and Peck's recommendation, amounted to intentional or reckless disregard of Plaintiff's condition.  *See Ventura v. Sinha*, 379 F. App'x 1, 3 (2d Cir. 2010) (summary order) (affirming summary judgment for defendant that did not refer plaintiff to an orthopedic specialist where plaintiff's "diagnostic tests and X-rays confirmed no remarkable results"); *Mena*, 2018 WL 4328827, at *7 (granting summary judgment to defendants because, "[w]here a prisoner's x-rays show 'no remarkable results,' failure to refer him to an orthopedic specialist does not amount to deliberate indifference" (citation omitted)); *see also Munger v. Cahill*, 792 F. App'x 110, 112–13 (2d Cir. 2020) (summary order) (affirming summary judgment for defendant whose treatment decisions "were based on medical evidence and [defendant]'s professional judgment about" what was "necessary to treat [plaintiff]'s condition").

Deliberate indifference is also not evidenced by Defendant's and the URC's reliance on the likely diagnosis of plantar fasciitis in rendering their November 2013 treatment decision, rather than considering the possibility that Plaintiff had some other condition, such as a herniated disc, as suggested many months later by Dr. Lewis in her August 2014 and May 2015 letters, or a mild disc bulge, as identified by an MRI in May 2015.  Putting aside that Defendant and the URC did not have Dr. Lewis's letters before them in November 2013, the Court does not accord much weight to Dr. Lewis's opinion given that she is not a specialist, she treated Plaintiff prior to his incarceration, there is no evidence that her prior treatment of Plaintiff related in any way to his complaints of foot and back pain, she had not examined Plaintiff as of the time of her letters, and

she was, therefore, speculating as to the possible cause of his foot and back pain.  By contrast, Drs. Ofori and Peck considered Plaintiff's medical history, examined Plaintiff in person, and offered consistent opinions that Plaintiff's pain was likely caused by plantar fasciitis.  (*See* Def.'s 56.1, Dkt. 47-4, ¶¶ 43; Dkt. 51-4, at ECF 51–52.)  Defendant's subsequent reliance on that diagnosis, and agreement with the URC's decision to act in a manner consistent with the standard of care for that condition—though it differed from Drs. Ofori's and Peck's recommendation—cannot be deemed deliberately indifferent.

Plaintiff makes several arguments to show that there are genuine disputes regarding the soundness of Defendant's decision to pursue conservative treatment.  The Court now considers and rejects each of these arguments.  *See Chance*, 143 F.3d at 703 ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.").  First, Plaintiff argues that Defendant either consciously disregarded or should have concluded that Plaintiff did not have plantar fasciitis.  (Pl.'s Opp'n, Dkt. 53, at ECF 13–14; Dkt. 53-3 at ECF 2.)  Although a January 2013 MRI of Plaintiff's feet did not show evidence of fasciitis (Def.'s 56.1, Dkt. 47-4, ¶ 30), in October 2013, Dr. Ofori determined that "left plantar pain [was] likely plantar fasciitis" (*id.* ¶ 42; Dkt. 51-4, at ECF 52).  Dr. Peck concurred in this diagnosis.  (*See* Dkt. 51-4, at ECF 52.)  Defendant, therefore, reasonably relied on this then-current, superseding diagnosis and approved a course of treatment that he believed was consistent with the standard of care for plantar fasciitis.  Notably, it was not until September 2014, when Plaintiff complained of pain on the top, rather than bottom, of his foot, that Dr. Borecky determined this diagnosis to be incorrect.  (Def.'s 56.1, Dkt. 47-4, ¶ 52.)  Plaintiff cannot have it both ways, arguing that Defendant should have second-guessed Dr. Ofori's plantar fasciitis diagnosis, but also that Defendant should have followed Dr. Ofori's recommendation for an orthopedic consultation based

on that diagnosis.  *Cf. Mena*, 2018 WL 4328827, at *5 ("A claim based on an inmate's disagreement with the defendants' medical judgment as to the proper course of treatment cannot support a constitutional claim for deliberate indifference." (citation omitted)).

Second, Plaintiff argues that Defendant's decision to deny him an evaluation by an orthopedist was "without merit" and delayed him getting the MRI that revealed a mild disc bulge. (Pl.'s Opp'n, Dkt. 53, at ECF 4.)  However, Plaintiff presents no evidence that an evaluation by an orthopedist would have resulted in a more expedient alternative diagnosis or better course of treatment.  In fact, the undisputed medical records show that, at least initially, conservative treatment may have been effective.  For example, on February 25, 2014, nearly four months after Defendant and the URC denied the orthopedic consultation, Plaintiff reported zero pain.  (Def.'s 56.1, Dkt. 47-4, ¶ 48.)  On April 6, 2014, Plaintiff reported sore calves from doing exercises, but no other medical complaints.  (*Id.* ¶ 49.)  And, on August 21, 2014, though Plaintiff reported low back and left-foot pain, he was still able to do 15 push-ups daily.  (*Id.* ¶ 50.)  Indeed, contrary to Plaintiff's assertion, the record suggests Defendant correctly predicted that conservative treatment "can take anywhere from six weeks to a few months to realize the full effect[.]"  (Def.'s Decl., Dkt. 47-3, ¶ 9.)  Moreover, none of the specialists that evaluated Plaintiff after Defendant and the URC denied him an orthopedic consultation recommended an evaluation by an orthopedist.  (*See* Def.'s 56.1, Dkt. 47-4, ¶¶ 65, 74, 76).  Nor did Dr. Lewis in her August 2014 and May 2015 letters to the MDC.  (Dkt. 53-1, at ECF 2–3.)  Rather, Dr. Lewis suggested a lumbar spine MRI, which Plaintiff received in May 2015, on the recommendation of his treating neurologist, Dr. Rosenbaum. (*See* Def.'s 56.1, Dkt. 47-4, ¶ 69; Dkt. 51-5, at ECF 143–45.)  Further, it was another *neurologist*, Dr. Alipour, who assessed Plaintiff's left leg pain as secondary to a bulging disc, *not an orthopedist*.  (*See* Def.'s 56.1, Dkt. 47-4, ¶ 74.)  In short, Plaintiff provides no evidence to impugn

the soundness of Defendant's medical judgment in denying an immediate orthopedic consultation in November 2013 based on the information available to Defendant and the URC at that time.

Finally, it appears that Plaintiff argues that his September 8, 2015 "ortho consult" at the "prosthetics clinic," during which he was measured for orthotic shoes and a back brace (Def.'s 56.1, Dkt. 47-4, ¶ 73), vindicates his contention that he should have been evaluated by an *orthopedist* two years earlier (Pl.'s Opp'n, Dkt. 53, at ECF 4–5, 8; Dkt. 53-2). Plaintiff offers no evidence that he was seen by an orthopedist during the September 8, 2015 consult (*see* Dkt. 51-5, at ECF 19), and the Court notes that the clinic he visited, Hanger clinic, does not appear to be staffed by "orthopedists," but only by "orthotists" and "prosthetists."[23]

\*      \*      \*

Thus, even when construing Plaintiff's arguments liberally and resolving all ambiguities in his favor, the Court finds that Plaintiff does not present any evidence from which a reasonable fact finder could conclude that Defendant "acted intentionally" to cause Plaintiff's condition or "recklessly failed to act with reasonable care" in treating Plaintiff's condition. *Darnell*, 849 F.3d

---

[23] The Court notes that Hanger clinic, where Plaintiff had his evaluation (Dkt. 51-5, at ECF 19), operates five locations in New York City, each listing "Care Team" members as credentialed "COs," "CPs," or "CPOs." *See* https://hangerclinic.com/clinics/NY/ (last visited Mar. 25, 2021). According to the American Board for Certification: Orthotics, Prosthetics, Pedorthics, "CO" refers to "Certified Orthotist," "CP" refers to "Certified Prosthetist," and "CPO" refers to "Certified Prosthetists Orthotist." *See* https://www.abcop.org/individual-certification/get-certified/orthotist-prosthetist/overview (last visited Mar. 25, 2021). A "orthotist" is a healthcare professional who works under a doctor's orders to make and fit braces and splints to support "body parts that have been weakened by injury, disease, or disorders of the nerves, muscles, or bones." *See* https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/orthotist-and-prosthetist (last visited Mar. 25, 2021). "A prosthetist is a healthcare professional who makes and fits artificial limbs [] for people with disabilities." *Id.* Neither an orthotist or prosthetist qualifies as an orthopedist, who is a medical doctor "specializ[ing] in the branch of medicine concerned with the correction or prevention of deformities, disorders, or injuries of the skeleton and associated structures." *See* https://www.merriam-webster.com/dictionary/orthopedist (last visited Mar. 25, 2021).

at 35; *Charles*, 925 F.3d at 87.  Defendant's participation in, and concurrence with, the URC's decision to deny an orthopedic consultation in favor of conservative treatment was informed by a review of Plaintiff's medical records, which included negative MRIs and x-rays, complaints of back and foot pain, and an October 30, 2013 then-current provisional diagnosis of plantar fasciitis, as well as an understanding of the standard of care for treating that condition.  (Edwin Decl., Dkt. 47-3, ¶ 9.)  This decision was an exercise of Defendant's sound medical judgment and Plaintiff has failed to present evidence that would lead a reasonable jury to conclude to the contrary. Accordingly, Defendant is entitled to summary judgment.

### III.      Qualified Immunity

Finally, the Court addresses the issue of qualified immunity.  Qualified immunity shields federal officials from *Bivens* liability "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Based on the undisputed evidentiary record, and for the reasons stated above, the Court finds that Plaintiff fails to meet the threshold question because he cannot show that Defendant acted with deliberate indifference in violation of Plaintiff's constitutional rights.  Where, as here, "a plaintiff cannot make the first showing, *i.e.*, a violation of constitutional rights, no further inquiry is necessary 'because where there is no viable constitutional claim, defendants have no need of an immunity shield.'"  *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013)).

While no further inquiry is necessary, the Court also finds that Plaintiff cannot show that Defendant violated a "clearly established" right when he denied Plaintiff an immediate evaluation by an orthopedist.  "To be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Gonzalez v.*

*City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  This standard is "deliberately forgiving in order to give public officials breathing room to make reasonable but mistaken judgments without fear of disabling liability."  *Ganek*, 874 F.3d at 81 (internal quotation marks and citations omitted).  Plaintiff has failed to put forth any evidence that, in November 2013, Defendant would have had notice that denying an immediate orthopedic consultation constituted deliberate indifference, especially in light of Plaintiff's medical records and the standard of care for plantar fasciitis.  The undisputed record shows that Defendant made a reasonable medical judgment, that even if mistaken, does not deprive him of qualified immunity.

## CONCLUSION

For all of the reasons stated herein, the Court grants Defendant's motion for summary judgment.  The Clerk of Court is respectfully requested to enter judgment and terminate this case.  The Court certifies pursuant to 28 U.S.C. §1915(a)(3) that any appeal of this Memorandum and Order would not be taken in good faith, and therefore, *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 25, 2021
        Brooklyn, New York